IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JORGE GARCÍA MONAGAS, et al.,

     Plaintiffs,

     v.

W. HOLDING COMPANY, INC., et al.,

     Defendants.

Civil No. 07-1217 (ADC/BJM)

## REPORT AND RECOMMENDATION

Plaintiffs Jorge, Diego, and Giselda García-Monagas ("plaintiffs" or the "García-Monagas siblings") bring this case complaining in their First Amended Complaint (the "complaint") of an alleged scheme to defraud them of property originally belonging to plaintiffs' grandmother which plaintiffs claim should have been "reserved" for their benefit. (Docket No. 93). Defendants Myriam García Barber, Flavia Vilella García, Fiori Vilella García, Zulma Vilella García, Manuel Moreda, and Blanca Toledo de Moreda moved to dismiss the complaint. (Docket Nos. 110, 144, 146). Plaintiffs duly opposed. (Docket Nos. 121, 157, 170). This case was referred to me for a report and recommendation. (Docket Nos. 122, 132).

## FACTUAL AND PROCEDURAL BACKGROUND

On a motion to dismiss, "the facts are set forth as alleged in the complaint and inferences [are] taken in the light most favorable to ... the non-moving party." Díaz-Romero v. Mukasey, 514 F.3d 115, 116 (1st Cir. 2008).

This case concerns plaintiffs' claims for property originally belonging to their grandfather, Diego García St. Laurent, and acquired by their grandmother, Antonia Cabassa Texidor, after her husband's death. (Docket No. 93, p. 5). The property includes real property and shares of stock in Central Eureka, Inc., which later formed the basis for the formation of Westernbank (the "contested property"). (Id., p. 30). Plaintiffs claim they are entitled to the contested property because their

grandmother was required to reserve that portion of her first husband's estate for them by operation of the "widow's reserve" provisions of the Puerto Rico Civil Code. (Id., p. 5). That law requires a widow entering a second marriage to set apart for the children and descendants of her first marriage the ownership of all property which the widow acquired from the deceased first spouse. 31 L.P.R.A. § 2731 (the "widow's reserve statute"). The complex set of alleged facts concern a family history dating back over a hundred years, and a more recent alleged scheme to defraud plaintiffs of an inheritance hinging on that long family history.

The relevant facts in this case begin in 1904, when plaintiffs' grandfather, García St. Laurent died, leaving plaintiffs' grandmother, Cabassa Texidor, a widow. (Docket No. 93, p. 4). Their marriage produced four children, including plaintiffs' father, Jorge Placido García Cabassa. (Id., p. 65, 69). Cabassa Texidor brought no property to the marriage and no profits were generated from the marriage. (Id., p. 4). Plaintiffs allege that Cabassa Texidor "fraudulently acquired" certain properties from the estate of García St. Laurent and "[stole] a meaningful portion" of her descendants' "rightful inheritance from them." (Id., p. 5). Plaintiffs' allege that by virtue of her acquisition of these properties, she converted the estate of García St. Laurent into property subject to the widow's reserve statute. (Id., p. 6). At some point following García St. Laurent's death, plaintiff's father sold at least part of his share of his father's estate to his mother. (Id., p. 17-18).

Cabassa Texidor later entered into a second marriage with Mateo Fajardo Cardona and they had a son, Teodoro Fajardo Cabassa. (Id., p. 5 ). She died in 1973, leaving an estate allegedly composed of property subject to the widow's reserve statute. (Id., p. 5). According to plaintiffs, her estate has not been fully distributed and the civil estate case remains open. (Id., p. 5, 49).

Plaintiffs claim that defendants composed a RICO enterprise which appropriated property from Cabassa Texidor's estate, and denied plaintiffs their rightful portion of that estate. (Id., p. 15). The alleged fraud has occurred through deeds, sworn statements, testimonies, corporate reports, and statutorily mandated filings. (Id., p. 15). Specifically, through these defendants' false statements in previous state court proceedings, plaintiffs have been "made to believe ... that no right existed

which could legally accommodate their claims." (Id., p. 17).  These alleged falsehoods have led to the entry of multiple decisions in state court that plaintiffs concede are *res judicata*.  (Id., p. 17).

Plaintiffs allege that the RICO enterprise has existed since García Laurent's death in 1905, in various forms: the estate of García Laurent, Central Eureka, Inc. ("Eureka"), the estate of Cabassa Texidor, and Westernbank.  (Id., p. 23).  Eureka is a sugar producing company formed with property transferred from the estate of García St. Laurent to which plaintiffs claim to have a legal right.  (Id., p. 69).  Westernbank was formed using capital from Eureka and from the estate of Cabassa Texidor to which plaintiffs claim to have a legal right.  (Id., p. 34).  They allege that the enterprise is currently controlled by Frank Stipes, who is President of Westernbank and a descendent of Miguel García Méndez ("García Méndez"), who was Cabassa Texidor's attorney and alleged prior head of the enterprise.  (Id., p. 14, 16, 22).  The alleged racketeering activity consists of "treating the [estate of Cabassa Texidor] as if the property were actually property of [Cabassa Texidor], when in fact the bulk of the called [sic] 'Estate' was composed of Reservable property under [the widow's reserve statute that] actually belonged to the [original heirs of García St. Laurent]", including plaintiffs.  (Id., p. 28).

Specifically, plaintiffs allege that Stipes and certain other defendants failed to disclose plaintiffs' claims in each of its annual reports and federal filings, which were transmitted by mail and wire.[1]  (Id., p. 37).  Additionally, plaintiffs allege that each time a Westernbank share is sold or bank monies are invested, property rightfully belonging to plaintiffs is transported across state lines and the scheme is furthered.  (Id., p. 26).

Part of the scheme explicitly concerns the conduct of the prior litigations.  Plaintiffs allege that the prior litigation "was about property that did not 'exist' legally as stated" because it was improperly appropriated and should have been subject to the widow's reserve statute.  (Id., p. 31).  In particular, "the preparation and presentation of false and fraudulent documents... which were used

---

[1] Plaintiffs do not specify whether these documents were transmitted through *interstate* mail and wires.

by defendants in the State Court cases to prove title to properties, were all part of the Scheme [ ] to defraud [plaintiffs].” (Id., p. 31).  In sum, they “have been consistently denied their rights by a series of legal maneuvers and legal decisions based on false information.”  (Id., p. 51).   Moreover, plaintiffs allege that certain defendants have made appearances in Puerto Rico state courts opposing plaintiffs’ demands to the contested property, and each such appearance constitutes a predicate act. (Id., p. 46).   They allege that “in total disregard for the law, no [Puerto Rico] court has ever mentioned the words Widow’s Reserve,” and thus, they “are entitled as a matter of a constitutional right to the application” of the widow’s reserve statute.  (Id., p. 51).

Plaintiffs also claim as predicate acts violations of 18 U.S.C. § 1512 and 1513, which prohibit tampering with or retaliating against a federal witness. (Id., p. 41).  Specifically, they allege the forceful removal of the grandson of one of the plaintiffs from the premises of the Mayagüez Resort and Casino in 2007, “presumably because he indicated to process servers the identities of defendants Stipes and Ileana García de Carr,” and forceful removal by police power of plaintiff Diego García Monagas and his family from a fishing tournament in 2006.  (Id., p. 25-6).

Plaintiffs’ alleged injury is that they have been deprived of at least $15 million in converted property to which they should have been entitled through the widow’s reserve statute by the actions of the alleged RICO defendants “in not recognizing the legal ownership” which they should have enjoyed.  (Id., p. 25, 48).

Plaintiffs allege the following causes of action:  (1) violation of 18 U.S.C. § 1962(c) based on improper management and operation of Westernbank and Eureka ; (2) violation of 18 U.S.C. § 1962(a) based on laundering money and property which “are in fact, and should be adjudged the property” of plaintiffs; (3) violation of 18 U.S.C. § 1962(a),(b), and (c) based on a conspiracy to deny plaintiffs’ claims “in all ways possible”; (4) bank fraud in violation of 18 U.S.C. § 1344 based on failing to communicate relevant information regarding bank shares and concealing and denying plaintiffs’ rights to the contested property; and (5) securities fraud in violation of 15 U.S.C. § 78j and 78n(a) based on Westernbank’s failure to disclose plaintiffs’ claims, and a drop in share price due

to improper lending practices.  (Id., 55-60).  Plaintiffs' prayer for relief requests damages of up to $15 million, a declaration of plaintiffs' rights under the widow's reserve statute, equitable relief prohibiting alienation of Westernbank shares pending final disposition of this case, treble damages under RICO, and that all Puerto Rico state court actions be stayed because their untimely decisions "are the equivalent of the denial of justice" and because they "have shown a marked proclivity for deciding on the basis of misleading information which has induced them to error."  (Id., 61-62).

Plaintiffs brought this action against certain family members, former attorneys of their adversaries in prior state court cases, and the officers and directors of Eureka and Westernbank. They also name as defendants certain individuals who they claim are indispensable parties as descendants of Cabassa Texidor.  (Id., p. 12).  With respect to the defendants who moved to dismiss the complaint, the court is unable to locate any specific allegations concerning defendants Myriam García Barber, Manuel Moreda, and Blanca Toledo de Moreda, and notes that plaintiffs' briefs on this motion do not identify any such allegations.[2]  Zulma, Fiori, and Flavia Vilella García (the "Vilella-García siblings") are plaintiffs' cousins and also granddaughters of Cabassa Texidor.  (Id., p. 47).  They are identified as "indispensable parties" as descendants of Cabassa Texidor, as well as identified as members of the RICO enterprise who violated 18 U.S.C. § 1962.  (Id., p.12, 14, 28) . The Vilella-García siblings are alleged to have "co-conspired with actors by acquiescing to the responses filed to cases in the Commonwealth Courts, and by actively denying [plaintiffs'] rights." (Id., p. 25).  The complaint states that they "are also believed by Plaintiffs to be entitled to the widow's reserve."  (Id., p. 47).

Plaintiffs commenced this action on March 15, 2007, and amended their complaint on January 25, 2008.  (Docket No. 93).  Defendants Garcia Barber, the Vilella-García siblings, Manuel Moreda, and Blanca Toledo de Moreda moved to dismiss the complaint (Docket Nos. 110, 144,

---

[2] The court is able to discern from the decisions in prior cases between the parties that Manuel Moreda was counsel for Cabassa Texidor in plaintiffs' 1968 and 1970 lawsuits against her.  See, infra, p. 10-11.  (Docket No. 144-2, p. 11).  García Barber is plaintiffs' cousin, and also a descendent of Cabassa Texidor.  (Id., p. 23).

*García Monagas et al. v. W. Holding Co., Inc., et al.*                                    Page 6
Civil No. 07-1217 (ADC/BJM)
**REPORT AND RECOMMENDATION**

146), and plaintiffs opposed.  (Docket Nos. 121, 157, 170).

## DISCUSSION

**I.      Standard on a Motion to Dismiss**

Defendants move to dismiss the complaint under Rule (12)(b)(1) for lack of subject matter jurisdiction and under Rule12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1), (6).  The Supreme Court recently held that to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955, 1965 (2007).  This decision "retire[d]" the prior standard, 127 S.Ct. at 1969, under which a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."   Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Even under the new framework, however, a court should still "accept well-pled factual allegations in the complaint as true and make all reasonable inferences in the plaintiff's favor."   Miss. Public Employees' Retirement System v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).  While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp., 127 S.Ct. at 1964-1965(internal citation omitted).

However, on a motion to dismiss for lack of subject matter jurisdiction, the court can look beyond the pleadings to additional materials in order to determine jurisdiction.  González v. United States, 284 F.3d 281, 288 (1st Cir. 2002).  Rule 12(b)(1) may be used to attack two different types of defects: first, it may attack the facial sufficiency of the jurisdictional allegations of the complaint; second, it may challenge the factual basis for the court's subject matter jurisdiction even despite the formal sufficiency of the jurisdictional allegations of the complaint.  See Wright & Miller, Federal Practice & Procedure, Civil 3d § 1350 (2006).  Under Rule 12(b)(1), "dismissal would be proper if the facts alleged reveal a jurisdictional defect not otherwise remediable." Dennehy v. Frambes, 385

F.Supp.2d 121, 123 (D.P.R. 2005). Once contested, the burden ultimately is on the plaintiff to prove

the existence of subject matter jurisdiction. <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir.

1995).

## II.    Analysis

Defendants move to the dismiss the complaint on the grounds that (1) the court lacks

jurisdiction based on the Rooker-Feldman doctrine; (2) the claims and issues have already been

adjudicated by Puerto Rico state courts and are therefore barred by claim and/or issue preclusion;

and (3) the complaint fails to state a claim for relief under RICO and federal securities laws.

### A.        Rooker-Feldman Doctrine

The Rooker-Feldman doctrine, which takes its name from two Supreme Court cases, <u>Rooker

v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>,

460 U.S. 462 (1983), places jurisdictional limitations on cases requesting federal district court

review of state court decisions.  Based on a reading of 28 U.S.C. § 1257, which provides that final

judgments of state courts may be reviewed by the Supreme Court, the Court held, "a United States

District Court has no authority to review final judgments of a state court in judicial proceedings.

Review of such judgments may be had only in this Court." <u>Feldman</u>, 460 U.S. at 482.  The Rooker-

Feldman doctrine applies equally to cases complaining of injuries in the Puerto Rico commonwealth

courts through 28 U.S.C. § 1258, which extends section 1257 to final judgments of the Puerto Rico

Supreme Court. <u>See</u>, <u>e.g.</u>, <u>Federación de Maestros v. Junta de Relaciones del Trabajo</u>, 410 F.3d 17

(1st Cir. 2005).

The Supreme Court recently clarified that the doctrine applies only to "cases brought by

state-court losers complaining of injuries caused by state-court judgments rendered before the district

court proceedings commenced and inviting district court review and rejection of those judgments."

<u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005).  Therefore, for the

Rooker-Feldman doctrine to operate and deprive a court of jurisdiction, the case must be (1) brought

by a state court loser complaining of an injury in state court, (2) brought in federal court after the

state court proceedings have ended, and (3) invite a district court to review and reject the state court

judgment. Federación de Maestros, 410 F.3d at 27.

### B.        Law of *Res Judicata* and Collateral Estoppel

While the Rooker-Feldman doctrine is a jurisdictional principle, *res judicata* is an affirmative

defense. R.G. Financial Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006) (citing Fed. R.

Civ. P. 8(c)). In this case, *res judicata* is premised on the statutory requirement – implementing the

Full Faith and Credit clause of the Constitution – that federal courts give the same preclusive effect

to state court judgments that those judgments would be given in the courts of the State from which

those judgments were rendered. 28 U.S.C. § 1738. For purposes of the full faith and credit analysis,

Puerto Rico is the functional equivalent of a state. Cruz v. Melecio, 204 F.3d 14, 18 n.2 (1st Cir.

2000). In determining the preclusive effect of decisions rendered by the Puerto Rico commonwealth

courts, Puerto Rico law supplies the rule of decision. R.G. Financial, 446 F.3d at 183.

Under Puerto Rico law, the Civil Code sets forth the doctrine of *res judicata*:

> *In order that the presumption of the res adjudicata may be valid in another suit, it is*
> *necessary that, between the case decided by the sentence and that in which the same is*
> *invoked, there be the most perfect identity between the things, causes, and persons of the*
> *litigants, and their capacity as such.*

31 L.P.R.A. § 3343. The First Circuit has interpreted this statute to require that a defendant asserting

the *res judicata* defense establish three elements: (1) the existence of a prior judgment on the merits

that is "final and unappealable," (2) a perfect identity of thing or cause between the two actions, and

(3) a perfect identity of the parties and the capacities in which they acted. R.G. Financial, 446 F.3d

at 183. Despite this language, "the phrase 'perfect identity' cannot be taken literally." Id.

The first prong is derived from the Puerto Rico law requirement that a judgment be "final y

firme," a term which the First Circuit holds "is no doubt [used by] the Puerto Rico Supreme Court

... to denote unappealability." Cruz, 204 F.3d at 20. Therefore, a commonwealth court decision

cannot be granted preclusive effect until all available appeals have been exhausted or the time for

making them has expired. Id. If a state court judgment becomes final during the pendency of the

federal suit, it is irrelevant whether it was final at the time the federal complaint was filed (unlike in the Rooker-Feldman test). Boateng v. Interamerican University, 210 F.3d 56, 63 (1st Cir. 2000).

The purpose of the second prong is to "guarantee that the rights and obligations of a particular litigant will not be foreclosed without that litigant's knowledge or opportunity to participate." R.G. Financial, 446 F.3d at 185. The Puerto Rico Supreme Court takes a "pragmatic stand" on the construction of this requirement. Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones, 20 P.R. Offic. Trans. 607, 632, 120 P.R. Dec. 580 (1988). In particular, "It is understood that there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of [obligations] among those having a right to demand them, or the obligation to satisfy the same." Id.

With respect to the third prong, two actions have an identity of "things" if a decision in the second action might contradict "a right arisen or arising from, or a right affirmed by a prior decision." Id. at 183 (citing A & P Gen. Contractors, Inc. v. Asociación Cana, Inc., 110 D.P.R. 753, 10 P.R. Offic. Trans. 984, 986 (1981)). The term "cause" refers to the factual, not legal, cause, and "a mere difference in the legal theories on which two causes of action are grounded does not destroy the identity of thing or cause that otherwise exists between two suits arising out of a common nucleus of operative fact." Id. at 183, 184. In other words, under Puerto Rico law, *res judicata* "precludes the subsequent litigation of all claims that either were or could have been asserted in a prior action." Id. See also Boateng, 210 F.3d at 62 (due to operation of *res judicata*, plaintiff "did not have a right to bring separate and successive suits on different legal theories arising out of a single nucleus of operative facts").

Under Puerto Rico law, collateral estoppel is considered a "variant" of the *res judicata* doctrine. A & P Gen. Contractors, 10 P.R. Offic. Trans. 984. The relevant statutory provision, 31 L.P.R.A. § 3343, uses the term, "*res adjudicata*," although it "encompasses both the doctrine of *res judicata* (i.e., claim preclusion) and the doctrine of collateral estoppel (i.e., issue preclusion), albeit

with slightly different requirements for each." R.G. Financial, 446 F.3d at 183.  Collateral estoppel is distinct from *res judicata* in that "identity of causes is not necessary."  A & P Gen. Contractors, 10 P.R. Offic. Trans. 984.  Collateral estoppel by judgment, as the doctrine is known under Puerto Rico law, "is effective when a fact essential for rendering a judgment is elucidated and determined in a final and valid judgment.  As a result, said determination is conclusive in a second action between the same parties, even when there are different causes of action."  Id.

Collateral estoppel may also apply in cases where the parties are not identical to those in the first proceeding.  In such situations, the Puerto Rico Supreme Court has distinguished between the offensive and defensive use of collateral estoppel, noting that,"[w]hile the defensive use of the doctrine ... has generally been accepted, its offensive use has been the subject of serious debate."  Id. Under Puerto Rico law, it is proper for collateral estoppel to be "asserted defensively by a defendant to bar the litigation of an issue that has already been raised and lost by the plaintiff in a prior suit against another party."  Id.

### C.      History of Related State Court Adjudications

Defendants argue that previous Puerto Rico state court judgments on the same issues bar plaintiffs' claims through the Rooker-Feldman doctrine, *res judicata*, and collateral estoppel.  Before considering the application of these doctrines to this case, it is worth setting forth a detailed summary of plaintiffs' long history of related state court proceedings.

**1.            Estate of Jorge García-Cabassa et al. v. Antonia Cabassa-Texidor, CS 68-404 (P.R. Super. Ct., Mayagüez Part, Oct. 24, 1973) (the "1968 case").  (Docket No. 144-2).[3]**

The García-Monagas siblings brought this action against their grandmother, Cabassa Texidor, alleging that although certain properties were registered under the name of Cabassa Texidor, plaintiffs had an ownership interest in them.  Specifically, plaintiffs argued that Cabassa Texidor had recorded

---

[3] This case was consolidated with one filed by plaintiffs' cousins making similar claims, Estate of Oscar García-Cabassa, et al. v. Antonia Cabassa-Texidor, CS 70-816 (P.R. Super. Ct., Mayagüez Part, June 10, 1974) (the "1970 case").  (Docket No. 144-2).

under her own name ownership of certain real estate from the property of her first husband, García St. Laurent, that rightfully belonged to his heirs, including plaintiffs. Plaintiffs made a similar claim with respect to ownership of 65 shares of Eureka, Inc.

The court found, first, that plaintiffs' father had sold to his mother, Cabassa Texidor, all of his hereditary rights in the estate of his father, García St. Laurent, in a legally valid sale in 1930. The court then held that Cabassa Texidor remained in possession as an owner of the contested real estate and stock shares quietly, publically, peacefully and without interruption for over thirty years. Therefore, Cabassa Texidor acquired legal ownership of the land and stocks through acquisitive prescription under 31 L.P.R.A. §§ 5276 and 5280. The court granted summary judgment against plaintiffs and ordered them to pay attorneys fees.

The consolidated 1968 and 1970 cases were appealed to the Puerto Rico Supreme Court, and on October 18, 1974, the Court denied the writ of review in case numbers R74-242 and R73-368. (Docket No. 144-5, p.14). See also Fajardo Heylinger v. Fajardo-Dávila, IAC 98-0430, at ¶64 (P.R. Super. Ct., Mayagüez Part, Dec. 23, 2003) (Docket No. 144-2, p. 29) (providing procedural history).

**2.          <u>García-Monagas et al. v. García Méndez, AC 90-0153 (P.R. Super. Ct., Mayagüez Part, July 31, 1995) (the "1990 case"). (Docket No. 144-4).</u>**

This case, also brought by the García-Monagas siblings, was based on the theory that property belonging to their father was placed under the administration of their grandmother when their grandfather died. Plaintiffs alleged that their grandmother improperly transferred the contested property to Mateo Fajardo-Cardona, who co-mingled the property with his own to form the Eureka Sugar Mill, Inc. (Docket No. 144-4, p. 19). Defendants included moving defendants here, the Vilella-García siblings and Miriam García-Barber, among a long list of others. (Id., p. 20). Defendants moved to dismiss the suit on the grounds that it was *res judicata* by operation of the Puerto Rico Supreme Court decision in the 1968 case, and the court agreed. (Id., p. 24).

The court analyzed each of the factors in the *res judicata* analysis, using a four-factor test. First, the court found that there was an "identity of things" between the two cases because "[t]he thing

or the object in these cases is the validity of the title to property acquired by Antonia Cabassa-Texidor." (Id., p. 34-35). Second, there was an identity of causes because "the cause or motive to petition is the inheritance that plaintiffs claim rights to for the property of their father, Jorge García-Cabassa." (Id., p. 36). On the third prong, the court rejected plaintiffs' arguments that there was not an identity of people owing to a difference in defendants. First, the court found that there was "total juridical solidarity as well as an indivisibility of loans and services" between Cabassa-Texidor in the first suit, and those individuals against whom plaintiffs now brought claims for the same property. (Id., p. 38). Additionally, the court observed that this prong was unnecessary because preclusion was invoked defensively and under Puerto Rico law, a common identity of the parties was not necessary in the defensive use of collateral estoppel. (Id., p. 39 (citing A & P Gen. Contractors, 110 D.P.R. 753)). Finally, the court found that the fourth prong was satisfied because there was an identity of the character in which plaintiffs appeared in the two suits; namely, claiming to be heirs of their father and thus heirs of their grandfather. (Id.). The court dismissed the case, charged plaintiffs with costs and fees, and concluded that "plaintiffs' claim lacks all merits and is nothing more than an attempt to re-litigate what was resolved against them twenty years ago." (Id., p. 41).

Plaintiffs appealed this decision to the Circuit Court of Appeals, which affirmed the judgment. García-Monagas et al. v. García-Méndez et al., KLAN9501087 (P.R. Cir. Ct. Appeals, Circuit IV, Sept. 11, 1997) (Docket No. 144-4, p. 44-56; 144-5, p. 1-13). The circuit court found that plaintiffs' claims were barred by collateral estoppel, and agreed with the superior court's reasoning on each of the four factors. In affirming the lower court's judgment, the court stated, "we should emphasize that the transactions impugned by the appellants occurred at the turn of the century, the last of them ... in 1936." (Id. at 9). As a result, "[u]nder any parameter that may be considered, we are forced to conclude, as did the Court before us in case 68-404 [the 1968 case], that any defect in the title of the appellee over the property in question has been corrected by time, ... that any claim that appellants may have had, whether it claimed inheritance or restoration of the property of the estate, ... or claimed compensation for damages, has similarly been extinguished. (Id., at 10) (internal citations omitted).

Plaintiffs appealed the circuit court decision to the Puerto Rico Supreme Court, which denied the writ of review.  García Monagas, et al. v. García-Méndez, et al., AC-97-0049 (P.R. March 17, 1998) (Docket No. 144-5, p. 16).  See also Fajardo Heylinger v. Fajardo-Dávila, IAC 98-0430, at ¶64 (P.R. Super. Ct., Mayagüez Part, Dec. 23, 2003) (Docket No. 144-2, p. 32-33) (providing procedural history).

3.        **Fajardo Heyliger, et al., v. Fajardo-Dávila, et al., IAC98-0430 (P.R. Super. Ct., Mayagüez Part, Dec. 23, 2003) (the "1998 cases").   (Docket No. 144-2).**

This 2003 decision applied to eight consolidated cases.[4]  The García-Monagas siblings were the plaintiffs in seven and cross-claimants and counter-claimants in the eighth.  (Docket No. 144-2, p. 10).  All of their allegations were based on a theory of nullity for fraud against the court, arguing that the judgments in the 1968 and 1970 cases were the result of fraud in that the court was not apprised of the death of defendant, Cabassa-Texidor, during the pendency of those suits.  (Id.)  The defendants in these consolidated cases composed the estates of Cabassa Texidor and others, as well as W. Holding Company, and the lawyer who represented Cabassa Texidor in the 1968 and 1970 cases.  (Id., p. 11).

The court found that the claims being asserted by the García-Monagas siblings in the 1968 and 1970 cases were "of a substantive nature ... identical to those that are now being made" in the 1998 cases.  (Id., p. 33).  Therefore, the doctrine of *res judicata* and/or collateral estoppel by judgment required the court to dismiss the complaint in the 1998 cases.  (Id., p. 55).

This decision was affirmed by the Court of Appeals in case KLAN04-00188 and the Supreme Court of Puerto Rico denied certiorari in case CC2004-967.  See García-Monagas v. García-Cabassa, KAC2004-7686 (P.R. Super. Ct., San Juan Part, June 8, 2006) (Docket No. 144-5, p. 26) (providing procedural history).

---

        [4] The consolidated cases bear the case numbers IAC98-0430, IAC2003-0206, IAC2002-0286, IDP-2002-0175, IAC2002-0269ISCI2003-0037, IAC2003-0073, and IAC2003-0177.

4.        <u>**García-Monagas v. García-Cabassa,**</u> **KAC2004-7686 (P.R. Super. Ct., San Juan Part, June 8, 2006) (the "2004 case").  (Docket No. 144-5, p. 23).**

This case, also brought by the García-Monagas siblings, sought acknowledgment of plaintiffs' rights to assets that should have formed the "widow's reserve" of the estate of García St. Laurent. (Docket No. 144-5, p. 24).  Defendants in this case included moving defendants the Vilella-García siblings, Myriam García-Barber, and Manuel Moreda as executor of the estate of Teodoro Fajardo-Cabassa, among a large number of other defendants.  Plaintiffs argued that the case should not be dismissed on the grounds of *res judicata* because in the case before the court "they do not claim inheritance but rather the right to participate in the widow's reserve that should have been made by [Cabassa Texidor]."  (Id., p. 26).  The court disagreed, and found that the distinction was "essentially a matter of semantics rather than reality" because "the reserve is one of the components of precisely <u>an inheritance</u> to which the decedent's children are entitled."  (Id., p. 24, 26) (original emphasis).  The court found that the claim was identical to the one in prior suits, even if the specific term "widow's reserve" had not been previously invoked.  (Id., p. 26).  Specifically, the court found that the judgments in the 1968, 1970, 1990, and 1998 cases operated to bar the case by *res judicata*.  (Id., p. 25-28.)  Therefore, the court dismissed the case on *res judicata* grounds.

The court charged plaintiffs with attorneys fees and reprimanded their counsel for frivolously filing this case after the same claims had been previously dismissed on three other occasions.  (Id., p. 30-32).

The record indicates that an appeal is pending before the Court of Appeals of Puerto Rico, Case No. KLAN2006-1663.  (Docket No. 86, p. 9).

III.    **Application to this Case**

A.      **Rooker-Feldman Doctrine**

Because the Rooker-Feldman doctrine calls into question the court's jurisdiction over the subject matter of this case, that question must be resolved prior to inquiring into defendants' other theories, which are affirmative defenses to the merits of the case.

Under the Rooker-Feldman doctrine, a federal district court does not have subject matter jurisdiction over a claim (1) brought by a state court loser complaining of an injury in state court; (2) brought after the state proceedings have ended; and (3) asking the district court to review and reject the state court judgment. Federación de Maestros, 410 F.3d at 24. While plaintiffs have previously lost in state court cases that ended prior to the commencement of these proceedings, and complain of injuries caused by those cases (see, e.g., Docket No. 93, pp. 31, 51, 93), their complaint does not fit within the narrow third prong of the doctrine.

The Supreme Court has cautioned that there is only a "narrow ground occupied by Rooker-Feldman," and I exercise caution not to overstep that boundary. Exxon Mobil, 544 U.S. at 284. "Rooker-Feldman does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." Id.

In particular, a guidepost for determining the "narrow ground" of the doctrine is the Court's clear statement that the doctrine "is confined to cases of the kind from which the doctrine acquired its name". Id., 544 U.S. at 284. "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ., then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Id., 544 U.S. at 293. While plaintiffs' ownership interest in the contested properties is an essential element of their claims, their causes of action here include independent claims in a way that Rooker and Feldman did not. See Rooker, 263 U.S. at 414 (asking district court to declare state court decision unconstitutional and therefore "null and void"); Feldman, 460 U.S. at 486-87 (bringing federal suit against highest court of the District of Columbia and asking federal court to declare that D.C. court had acted arbitrarily and capriciously in its decision against appellants).

Here, while plaintiffs reference the state court judgments, and while their claims are certainly related to those state court adjudications, their claims allege injuries caused by defendants, not simply by the state court judgments. See McKithen v. Brown, 481 F.3d 89, 97-98 (2d Cir. 2007)

("applicability of the Rooker-Feldman doctrine turns ... on the causal relationship between the state-court judgment and the injury of which the party complains in federal court"). See also Puerto Ricans for Puerto Rico Party v. Dalmau, 07-2700 (1st Cir., Oct. 6, 2008) ("'kitchen sink' approach [of] plaintiffs' broadly written complaint" referencing state court proceedings does not implicate Rooker-Feldman doctrine). Plaintiffs now complain that defendants participated in a scheme with the object of denying plaintiffs' rights to their grandfather's estate through fraud and other acts. (Docket No. 93, p. 55-58). They also claim that they were injured by operation of defendants' alleged RICO scheme, RICO conspiracy, and securities fraud. (Id.). I therefore find that this case does not fall into the "narrow ground" of cases directly asking a federal court to overturn a state court judgment and is more properly considered under principles of preclusion, to which I now turn.

####   B.       Collateral Estoppel

Collateral estoppel, or issue preclusion, "is effective when a fact essential for rendering a judgment is elucidated and determined in a final and valid judgment." A & P Gen. Contractors, 10 P.R. Offic. Trans. 984. Under Puerto Rico law, it is proper for collateral estoppel to be "asserted defensively by a defendant to bar the litigation of an issue that has already been raised and lost by the plaintiff in a prior suit against another party." Id.

For purposes of this analysis, the Puerto Rico Supreme Court decisions in the 1968, 1990, and 1998 cases are each firm, final, and unappealable decisions which may potentially preclude plaintiffs' claims here.

While the complaint in this action is not a model of clarity, in this posture the court interprets it in the light most favorable to plaintiffs. The best that can be said is that it brings the following claims: (1) violation of 18 U.S.C. § 1962(c) based on improper management and operation of Westernbank and Eureka and denying plaintiffs' right to the contested property; (2) violation of 18 U.S.C. § 1962(a) based on laundering money and property which "are in fact, and should be adjudged the property" of plaintiffs; (3) violation of 18 U.S.C. § 1962(a),(b), and (c) based on denying plaintiffs' claims "in all ways possible"; (4) bank fraud in violation of 18 U.S.C. § 1344 based on

failing to communicate relevant information regarding the original ownership of bank shares and concealing and denying plaintiffs' rights to the contested property; and (5) securities fraud in violation of 15 U.S.C. § 78j and 78n(a) based on Westernbank's failure to disclose plaintiffs' claims, and a drop in share price due to improper lending practices. (Id., 55-60). Importantly, each of these claims requires that plaintiffs have an ownership interest in the contested property.

The RICO statute makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity..." 18 U.S.C. § 1962(c). In order to plead a "pattern" of racketeering activity under RICO, a complaint must allege not only two or more predicate acts, but also demonstrate that those acts are related and pose at least a threat of continued criminal activity. Feinstein v. Resolution Trust Co., 942 F.2d 34, 44 (1st Cir. 1991). Here, the very definitions of the alleged RICO elements rely on the assumption that plaintiffs have an ownership interest in the contested property.

First, plaintiffs define the RICO enterprise as an association-in-fact headed first by Cabassa Texidor, who later passed control to Eureka, then to her former attorney, Miguel García Méndez, and her son from her second marriage, Teodoro Fajardo Cabassa, and finally to the grandson of García Méndez, Westernbank President Frank Stipes. (Docket No. 93, p. 16-17). Stipes, together with his mother and aunt, holds more than a 1% share of Westernbank and Eureka. (Id.) The "avowed purpose" of the enterprise was "to maintain and control enormous wealth and power, which by its own knowledge do not belong to it [] but which are the property of [plaintiffs]." (Id.) Thus, the RICO enterprise is defined as an association-in-fact formed for the purpose of maintaining control over assets which are actually property of plaintiffs.

Second, plaintiffs allege that the racketeering activity "consisted of treating the [estate of Cabassa Texidor] as if the property were actually property of [Cabassa Texidor], when in fact the bulk of the [so-]called 'Estate' was composed of Reservable property under [the widow's reserve statute]" and therefore "actually belonged to the [heirs of García St. Laurent]," including plaintiffs. (Id., p. 28).

Plaintiffs define the "pattern" of racketeering activity as "a persisting and reiterated scheme of conversion of hereditary goods, which belonged originally to the [heirs of García St. Laurent] and which were converted to the detriment of Plaintiffs..." (Id.)  Finally, plaintiffs allege a continued threat of criminal activity because defendants "continue to deny [plaintiffs'] rights and this activity threatens with continuation into the future." (Id., p. 25).  Thus, the alleged "pattern of racketeering activity" is defined as a continuing pattern of conduct denying plaintiffs' rights to the contested property through acts of conversion.  The foregoing RICO allegations are common to causes of action one through four, and for that reason, the first four counts rely on the veracity of plaintiffs' alleged ownership interest in the contested property.

In addition, each cause of action further depends on the assumption that plaintiffs have a cognizable ownership interest in shares of Eureka and Westernbank and the other contested property. The first cause of action is premised on a decline in the share price of Westernbank and Eureka caused by improper management of those companies for the benefit of the RICO enterprise and in furtherance of their overt RICO acts.  (Id., p. 56).  Through this conduct, defendants "damaged [plaintiffs] by their need to deny [plaintiffs'] Reserve interest in order to maintain control over the Enterprise." (Id.).  The second cause of action is based on laundering money and property "which in fact are the property, and should be adjudged the property of [plaintiffs]." (Id.).  The third cause of action alleges a RICO conspiracy conducted "for the purposes of maintaining the Enterprise" based on "denying [plaintiffs'] claims in all ways possible. (Id., p. 57).  The fourth cause of action alleges bank fraud based on the enterprises's actions "concealing and denying [plaintiffs'] right to the Reserve" and thus "depriv[ing] [plaintiffs] of their property." (Id., p. 57-58).  Thus, the success of each RICO cause of action depends on plaintiffs' ownership of the contested property, both by virtue of the common allegations and those unique to each claim.

For similar reasons, plaintiffs' fifth cause of action for securities fraud also relies on plaintiffs' claim to ownership rights of the contested property.  Title 15, United States Code, 78j, creates a cause of action for anyone injured as a result of "any manipulative or deceptive device or contrivance" in

connection with the sale of securities.  Plaintiffs claim that defendants engaged in securities fraud by failing to disclose in Westernbank's SEC filings and annual statements the Puerto Rico state court action filed by plaintiffs in 2004 despite defendants' "duty to disseminate prompt accurate and truthful information with respect to the Company's financial condition and performance." (Id., p. 59-60).  While plaintiffs also allege various other conduct resulting in a drop in Westernbank's share price, it is clear from the preceding fifty-plus pages of the complaint that the heart of this cause of action is plaintiffs' claim to an ownership interest in the contested property that was invested in Westernbank's predecessor, and Westernbank's failure to publically disclose that claim as a fact material to its value.  Thus, the securities fraud claim also depends on the merits of plaintiffs' claim to the contested property.

Plaintiffs are precluded from asserting an ownership interest in the contested property because the prior state court cases held in no uncertain terms that they did not have an interest in that property.  In the 1968 case, the Puerto Rico Supreme Court affirmed a decision holding that (1) Cabassa Texidor had legal ownership of the real estate and Eureka shares from the estate of García St. Laurent through acquisitive prescription (analogous to the U.S. common law concept of adverse possession); (2) that property did not rightfully belong to the heirs of García St. Laurent, including plaintiffs; and (3) plaintiffs did not have an interest in the challenged property.  (Docket No. 144-2).  In the 1990 case, plaintiffs again attempted to assert an interest in the contested property originally forming part of the estate of García St. Laurent, and the court rejected their claim.  The appellate court found their claim barred by the *res judicata* effect of the 1968 case, and agreed with the court in that case that "any defect in the title ... over the property in question has been corrected by time" and "any claim that [the García-Monagas siblings] may have had ... [has] been extinguished." (Docket No. 144-5, p. 10).  The Puerto Rico Supreme Court denied review, rendering the decision final and firm.  (Id., p. 16).  Plaintiffs then directly challenged the decision in the 1968 case, asking another commonwealth court to declare it nullified based on fraud.  (Docket No. 144-2, p. 10).  The court found that plaintiffs were asking the court to decide an issue that had already been decided, and dismissed the claim on the basis

of *res judicata*.  (Id., p. 55).  The Puerto Rico Supreme Court again denied review, rendering the

decision final and firm.  (Id., p. 26).  Thus, a final and firm decision over thirty years ago determined

that plaintiffs did not have an ownership interest in the contested lands and stock shares owned

originally by their grandfather and later by their grandmother, and two additional final and firm

decisions have confirmed that plaintiffs had no legal right to the contested property.

      Plaintiffs argue that their challenge here is distinct because none of these decisions address

the specific issue of a "widow's reserve."  This new legal theory asserting their right to the same

property does not change the result.  It is clear that under Puerto Rico law, "a mere difference in the

legal theories on which two causes of action are grounded does not destroy the identity of thing or

cause" under the *res judicata* test.  A & P Gen. Contractors, 10 P.R. Offic. Trans. 984.  Thus, while

plaintiffs here assert a right to the contested property based on a "widow's reserve" theory, this is

simply the newest in a long series of attempts to stake a claim to property that they have now been

contesting for forty years.  Invoking a new theory of estate law and wrapping it up in a cloak of

federal RICO and securities claims does not "destroy the identity" of their claim to the very same

"thing or cause" - that is, the contested property and their rights to it - that has been the subject of

multiple previous litigations.  Those prior litigations have clearly decided that plaintiffs do not have

a legal right to that property, and their attempt to cast the same argument in new theories cannot save

them from the *res judicata* effect of those decisions.[5]

      Finally, while many of the moving defendants have been defendants in prior litigation with

plaintiffs, collateral estoppel is asserted here defensively, and thus, it is not necessary that there be

complete identity of the parties.  Therefore, issue preclusion bars relitigation of plaintiffs' ownership

right against any of the defendants in this case, and merits dismissal of the case in its entirety.

---

    [5] This view is consistent with that of the most recent state court case, in which plaintiffs first
brought their "widow's reserve" claim, which held that the difference between the widow's reserve
argument and their prior arguments was merely one of "semantics" and plaintiffs' claim there was
identical to those brought and decided in prior cases.  (Docket No. 144-5, p. 24, 26).

### CONCLUSION

For the reasons stated above, I recommend that the motions to dismiss be **GRANTED**.[6] While not all defendants have joined the motions to dismiss, the foregoing analysis appears to apply to the disposition of the case as a whole. Therefore, plaintiffs are ordered to show cause within ten (10) days of receipt of this report and recommendation why the case should not be dismissed as to all defendants.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.   Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**.

At San Juan, Puerto Rico, on this 16th day of October, 2008.


**S/Bruce J. McGiverin**
BRUCE J. McGIVERIN
United States Magistrate Judge

---

[6] Defendants have also requested that the court order plaintiffs to pay attorneys' fees as a sanction under Rule 11.  (Docket Nos. 144, p. 11; 110; p. 5).  I reserve that determination until the district judge issues an opinion and order on the present report and recommendation.  I note, however, that each of the state court decisions described above has included a fee award upon finding that plaintiffs acted with temerity in bringing the cases.  (See Docket Nos. 144-2, p. 72 (1968 case); 144-4, p. 43 (1990 case); 144-2, p. 62 (1998 cases); 144-5, p. 33 (2004 case)).